THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DENNIS PEREZ, Defendant-Appellant.

First District (3rd Division) No. 1—88—2518

Opinion filed January 30, 1991.

458

Ryan, Miller & Trafalet, of Chicago (Mary Ellen Dienes, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Kevin T. Noonan, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CERDA delivered the opinion of the court:

Following a jury trial, the defendant, Dennis Perez, was convicted of delivery of a controlled substance (Ill. Rev. Stat. 1985, ch. 56½, par. 1401(a)(2)) and of calculated drug conspiracy (Ill. Rev. Stat. 1985, ch. 56½, par. 1405). He was sentenced to two concurrent terms of nine years' imprisonment and fined $11,500. At trial, the defendant relied on the affirmative defense of entrapment. On appeal, the defendant contends that: (1) he was denied his right to a speedy trial; (2) he was denied a fair trial because he was not allowed to present any character witnesses in his behalf; (3) he was denied a fair trial because he was not allowed to testify as to his state of mind while a State witness was allowed to testify to hearsay evidence; (4) he was denied a fair trial because the State did not comply with discovery requests concerning the government informant stating that they would not call the informant as a witness, but later the informant was allowed to testify without compelling the State to provide the discovery materials for impeachment purposes; (5) he was denied a fair trial when the trial court did not allow cross-examination of the State's informant witness about possible bias, interest, or motive to testify falsely; (6) he was denied a fair trial when the court did not allow him to call a witness in surrebuttal to impeach the testimony of the State's informant witness; (7) he was denied a fair trial when the court demonstrated hostility toward his attorney in the jury's presence; (8) the trial court erred in refusing to give certain jury instructions; (9) he was denied effective assistance of counsel; and (10) he was improperly convicted of a lesser included offense.

On October 28, 1986, the defendant was arrested for selling 220.51 grams of cocaine to undercover Drug Enforcement Agency (DEA) Agent Ludowig. Prior to the arrest, there were three drug transactions, on October 8, 16, and 28, 1986, arranged by Johnny Davis, a government-paid informant, acting on the instructions of Agent Ludowig. The DEA agent's investigation had been centered on Primitivo Rivera, who was originally a codefendant. Gabriel and Virginia Talavera, the alleged drug suppliers, were also codefendants. The case, however, was severed before trial.

At trial, Agent Ludowig testified that on October 8, 1986, he instructed informant Davis to purchase a one-ounce sample of cocaine

from Primitivo Rivera. The agent and informant drove to 2206 North California Avenue in Chicago, where the informant went into the Montana Realty Company, which was owned by the defendant, and came back out with Rivera and the defendant. After the three men conversed, the informant went back to the DEA agent's car and told him that there would be a delay in obtaining the drugs. The agent left, and when he returned, he saw Rivera and the defendant meet with the informant on the street. A conversation occurred among the three, and the defendant walked up the street where he met Gabriel and Virginia Talavera. There was an exchange between Virginia Talavera and the defendant. Then, the defendant, the informant, and Rivera walked to the agent's car and got in. The agent drove to a side street where the defendant gave him the cocaine package. At the defendant's request, the informant sampled the powder. The agent then paid the defendant the agreed upon $1,900, and the defendant told Agent Ludowig to deal only with Primitivo Rivera in the future.

Subsequently, Agent Ludowig instructed the informant to arrange a second one-ounce purchase of cocaine for $1,800 on October 16, 1986. When the agent and informant drove into the White Castle parking lot to make the purchase, the defendant and Rivera were standing next to the Talaveras' car. The defendant and Rivera entered the agent's car, and the defendant handed a package of cocaine to the agent, who gave the defendant $1,800 in cash. The defendant asked the informant and the agent to sample the powder. Davis sampled the cocaine, and the agent pretended to sample it. Again, the defendant told the agent to speak with Rivera concerning any future deals.

Pursuant to Agent Ludowig's directions, the informant arranged for a one-pound sale of cocaine for $23,000, to occur on October 28, 1986. An arrest was to be made at that time. The agent and informant met Rivera and the defendant in a Dunkin Donuts parking lot. According to Agent Ludowig's testimony, the defendant told the agent that the package would arrive shortly, that the transaction would be eight ounces at a time, and he wanted to cut out the informant and Rivera to deal only with Ludowig in the future. The agent left and, eventually, the transaction occurred in a Jewel parking lot. The informant met with the defendant and both returned to the agent's car. The defendant handed the informant a brown bag containing eight one-ounce plastic bags of cocaine, totalling 220.51 grams. The informant then handed the bag to the agent. At that point, the agent signaled to other DEA agents, who arrested the defendant, Rivera, and the Talaveras. Also at that time, the agents pretended to arrest the informant. The defend-

ant was taken to DEA headquarters. He then gave a statement admitting his participation in the three drug transactions.

The defendant testified that he lived above his realty company with his wife and four children. He met Primitivo Rivera, a licensed real estate salesman, in May 1986 and hired him in July 1986. The defendant met the Talaveras in July 1986 when they became tenants in an apartment building owned by the defendant. Gabriel Talavera owed the defendant money for an unpaid portion of the security deposit for the apartment. The defendant made an offer of proof that Talavera had offered to give cocaine to the defendant in exchange for the security deposit, but the defendant declined. The trial court did not allow the defendant to testify about the offer on the basis that it was hearsay even though the defendant sought to have it admitted for the effect of the statement on his state of mind.

The defendant further testified that he fired Primitivo Rivera on October 2, 1986, because he was not performing well as a salesman and the defendant was concerned about "what [Rivera] asked." The trial court did not allow the defendant to testify about the content of his conversation with Rivera. The defendant further testified that the informant began coming to the real estate office to see Primitivo Rivera in late July or early August 1986, visiting two or three times a week. On October 3, 1986, the informant came to the office looking for Rivera. After he found out that Rivera had been fired, he told the defendant that Rivera was a murderer and a "torch," and that he had murdered his wife by cutting her throat. He also said that the defendant was getting in the way of "their" economy. When the defendant told the informant to leave the office, the informant responded that the defendant was going to have to deal with him and Rivera and then left.

The next day, the informant and Rivera came to the office. The informant told the defendant that "a lot of bad things can happen" and that he knew the defendant had a handicapped daughter. He then warned the defendant that he would start doing business with them whether he liked it or not. The defendant asked them to leave and they did. The defendant then called Gabriel Talavera and asked him if he had an ounce of cocaine.

On October 6, 1986, the informant and Rivera returned to the defendant's office and asked if the deal was set up. The defendant testified that he was scared and that the informant again threatened his family. After the informant left the office, the defendant called Talavera and told him that he would forgive the $400 debt for the security deposit in exchange for the cocaine. The defendant's testimony

about the first two transactions was substantially the same as Agent Ludowig's testimony, except that the defendant testified that he not only told the agent to deal with Rivera in the future, but also that he did not want to be involved in the drug transactions and that he was scared. The trial court sustained as inadmissible hearsay the State's objections to defendant's testimony about his conversations with the informant and Rivera concerning his state of mind.

The defendant testified that, on October 15 or 16, 1986, the informant and Rivera came to the defendant's office wanting to buy a pound of cocaine. The defendant told them he would see what he could do, but did nothing. The next day, the informant returned. Finding out that the deal was not set up, he again threatened the defendant's family. The defendant contacted Talavera and set up the third transaction. On October 28, 1986, the third transaction occurred and the arrest followed.

The trial court, stating that the defendant's character was not an issue, did not allow the defendant to present any character witnesses. On rebuttal, the State called the informant, Johnny Davis, who denied ever threatening the defendant or his family, denied even knowing that the defendant had a family, and denied telling the defendant that Rivera had murdered his wife. The informant further testified that he met the defendant on October 8, 1986. He agreed that the defendant told him that he did not want to be involved in any more drug deals, but did not remember when that was said. The trial court did not allow the defense counsel to question the informant about any arrests that were pending during the time of the three drug transactions, including a September 1986 charge of possession of a controlled substance that was later nol-prossed. The defense counsel argued that the arrest just prior to the first drug transaction and the later dismissal of those charges were relevant to the informant's bias and interest to testify against the defendant in this case. Prior to the rebuttal witness testifying, the defendant had objected to the testimony based on the State's refusal to give background information about the witness and the quashing of two subpoenas for that information.

The defendant then attempted to call a surrebuttal witness for the purpose of impeaching the informant, but the trial court did not allow the testimony. Finally, the trial court did not allow an instruction on the informant witness' credibility. The defendant offered the instruction as a modification of Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981) (hereinafter IPI Criminal 2d), which is an instruction on accomplice witnesses. Instead, an IPI credibility of witnesses instruction was given.

■ The defendant's argument that the State failed to bring him to trial within the 160-day statutory period is without merit. The speedy trial act (Ill. Rev. Stat. 1987, ch. 38, par. 103—5(b)) requires a defendant on bail to be tried within 160 days from the date he demands trial. The defendant, who was on bail awaiting trial, filed a written demand for trial on February 3, 1988, and a second written demand for trial on April 18, 1988. The 160-day term would have terminated on July 12, 1988, but the trial began on June 15, 1988, which was within the required 160 days.

■ ■ The defendant next argues that he was denied a fair trial because he was not allowed to present character witnesses in his behalf. The defendant relied on the affirmative defense of entrapment, which occurs when the defendant's conduct is incited or induced by a public officer or employee, or agent of either. (Ill. Rev. Stat. 1985, ch. 38, par. 7—12.) For the entrapment defense to be used, the idea must not originate with the defendant, the agents must actively encourage the defendant to act, and the purpose of the encouragement must be for evidence to prosecute the defendant. (*Sorrells v. United States* (1932), 287 U.S. 435, 451, 77 L. Ed. 413, 422, 53 S. Ct. 210, 216; *People v. Fisher* (1979), 74 Ill. App. 3d 330, 333-34, 392 N.E.2d 975.) Once the defendant presents some evidence of entrapment, the burden shifts to the State to prove beyond a reasonable doubt that the defendant had a predisposition to commit the crime. (*People v. Jensen* (1976), 37 Ill. App. 3d 1010, 1014, 347 N.E.2d 371.) Under *Sorrells*, predisposition and criminal design are relevant to the entrapment defense. If the issues raised are pertinent to whether the defendant would be innocent except for the inducement by government officials, the Supreme Court explained, common justice requires that the accused be permitted to prove it. A searching inquiry into the defendant's conduct and predisposition is, therefore, appropriate. *Sorrells*, 287 U.S. at 451-52, 77 L. Ed. at 422, 53 S. Ct. at 216.

■ ■ In order to establish that his character traits are inconsistent with the commission of the crime charged, the defendant may introduce evidence of his good character and general reputation for the specific character trait. (*People v. Flax* (1986), 147 Ill. App. 3d 943, 951, 498 N.E.2d 667.) When the defendant attempted to call three character witnesses, the trial court disallowed the witnesses, stating that the defendant's character was not at issue. The defendant's character, however, is directly at issue in an entrapment defense. Although the trial court has considerable leeway in limiting testimony if it is cumulative, this testimony was not cumulative. The defendant was not allowed to call any witnesses except himself. Character witnesses

should be allowed to testify to facts that could lead the jury to conclude that there was no predisposition. The defendant attempted to call three character witnesses to testify to his good reputation in the community as a law-abiding citizen. By not allowing the defendant to call these character witnesses, the trial court hampered his ability to present a defense of lack of predisposition to sell drugs. Thus, the trial court committed error.

■ The defendant then asserts that the trial court erred by not allowing him to testify fully about his state of mind after the informant's repeated threats and after Talavera's offer of cocaine to pay the security deposit. The defendant attempted numerous times to testify to out-of-court statements that influenced his state of mind. Although the defendant was allowed to testify to some of these statements, the trial court sustained many of the State's objections on the basis that they were hearsay evidence. However, an out-of-court statement used for purposes other than establishing the truth of the matter asserted may be admissible to show state of mind of the recipient after hearing the statement. *People v. Davis* (1984), 130 Ill. App. 3d 41, 53, 473 N.E.2d 387.

Where the intention, motive or belief of the accused is material to the issue, he should be allowed to testify directly to that fact, and to have the circumstances surrounding the act considered in connection with his testimony. (*People v. Graves* (1978), 61 Ill. App. 3d 732, 741, 378 N.E.2d 293.) In *Graves*, the defendant, who claimed self-defense, was not allowed to testify to his state of mind during events that led up to the shooting. The court stated that the excluded testimony went directly to the crucial issue of the defendant's intent, motive, and belief. Therefore, if the jury believed the defendant's testimony, the court explained, it could have adequately explained the defendant's reasons for his actions prior to the shooting and might have provided a justification for the defendant's firing a second shot. Consequently, the court concluded, the jury should have had the benefit of that evidence in its deliberations. 61 Ill. App. 3d at 741.

■ Here, the motive of the defendant was material to the issue of a lack of predisposition, which is an essential element of entrapment. (*People v. Boalbey* (1986), 143 Ill. App. 3d 362, 364, 493 N.E.2d 369.) Therefore, the trial court committed error in not allowing him to testify to his state of mind after the informant's repeated threats and the offer of drugs made by his tenant, Talavera, in lieu of his security deposit.

The defendant next asserts that he was denied a fair trial when the State did not comply with requests for discovery about the govern-

ment informant. The State represented to the court that they would not call the informant as a witness, but later were allowed to call the informant to testify without being compelled to provide the discovery materials for impeachment purposes.

During the pretrial, defense counsel filed a motion for discovery and two subpoenas for background information concerning the confidential government informant, who arranged the drug transactions. Repeatedly, the defense counsel attempted to get discovery on the informant, and repeatedly, the assistant State's Attorney claimed that they would not call the informant as a witness, even stating "He's not going to take the stand unless [defense] counsel calls him." Based on the assistant State's Attorney's misrepresentations, the trial judge quashed two subpoenas for discovery on the witness.

Later, when the State called the informant as a rebuttal witness, they argued that their previous representations to the court only referred to their case in chief. They stated that they could not know for certain whether they would call a rebuttal witness until after the defendant's case was presented. The State did know, however, that the defendant was presenting an entrapment defense. The informant, who had been an integral part of the DEA's drug operation, was the only State witness able to testify to the defendant's predisposition to commit the crime. Such testimony is crucial under the entrapment theory because once the defendant presents some evidence of entrapment, the burden shifts to the State to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime; that is, whether he was ready and willing to commit the crime without persuasion. *Boalbey*, 143 Ill. App. 3d at 365, 493 N.E.2d 369.

■ Predisposition can be shown in numerous ways, including (1) assessing the character or reputation of the defendant; (2) whether the suggested criminal activity was made by the government; (3) whether the defendant was engaged in criminal activity for profit; (4) whether the defendant expressed reluctance to commit the offense which was overcome only by repeated government inducement or persuasion; (5) the nature of the inducement or persuasion applied by the government (*United States v. Perez-Leon* (7th Cir. 1985), 757 F.2d 866, 871; *United States v. Lazcano* (7th Cir. 1989), 881 F.2d 402, 406); (6) the defendant's ready access to a source (*People v. Dempsey* (1980), 82 Ill. App. 3d 699, 702, 402 N.E.2d 924, citing *People v. McSmith* (1961), 23 Ill. 2d 87, 89); (7) the defendant's prior connection with the crime (*Boalbey*, 143 Ill. App. 3d at 365); (8) the defendant's previous criminal record (*Boalbey*, 143 Ill. App. 3d at 365); (9) the defendant's familiarity with drugs (*Dempsey*, 82 Ill. App. 3d at 702, citing *McSmith*, 23 Ill. 2d

at 89-90); and (10) his willingness to accommodate those who wanted to obtain drugs (*Dempsey*, 82 Ill. App. 3d at 702). The DEA agent did not have any independent knowledge of those factors. Only the informant did.

The defendant relies on *People v. Jones* (1966), 73 Ill. App. 2d 55, 58, 219 N.E.2d 12, to argue that, where the crucial elements of the State's case depend upon the work of an informant, he must be called upon to controvert the testimony of the defendant tending to prove entrapment. However, *Jones* was decided when there was a *per se* rule that entrapment existed if a police agent provided the defendant with the narcotics. Although this may not still be good law, recent case law states that if there is an unexplained failure to call a participating informant, an unfavorable inference against the State may arise. (*People v. Johnson* (1989), 191 Ill. App. 3d 940, 945, 548 N.E.2d 433.) The State argues that they were not required to call the informant and that such evidence could have been obtained on cross-examination of the defendant. Even if that were true, it seems unlikely that the State would allow an unfavorable inference to be made. The informant, who was under the State's control, was not unavailable to testify as evidenced by the State making him available for an interview on May 16, 1986.

■ The defendant further argues that the subpoenaed information concerning the informant was necessary for the preparation of his defense. The United States Supreme Court in *Roviaro v. United States* (1957), 353 U.S. 53, 60-61, 1 L. Ed. 2d 639, 645, 77 S. Ct. 623, 628, ruled that the informant privilege must give way to the defendant's need for disclosure in preparing his defense if an undisclosed informant took an active role in the crime and might be a material State witness during trial. Numerous factors are considered by Illinois courts in determining whether the defendant's constitutional right to intelligently prepare a defense and to receive a fair trial necessitates disclosure of information regarding the informant's identity and/or the contents of his communications to law-enforcement officials. (*People v. Raess* (1986), 146 Ill. App. 3d 384, 390, 496 N.E.2d 1186.) These factors include (1) whether the informant played an active role in the criminal act by participating in and/or witnessing the offense, or (2) whether the informant assisted in setting up its commission as opposed to being merely a tipster. *Raess*, 146 Ill. App. 3d at 390.

■ Here, the informant clearly played an active role in the criminal acts. He set up and participated in all three drug transactions. He was a crucial witness for the State. It would be reasonable to conclude that the State anticipated calling the informant as a rebuttal witness.

Therefore, the defendant was entitled to the discovery information he requested in his subpoenas.

The State complied with some discovery requests. They made the informant available to the defense counsel to be interviewed on May 16, 1988, but he refused to speak with the defense counsel. Also, the State tendered to the defendant vouchers and expenses for October 1986, the Bureau of Investigation records, and the Chicago rapsheet. However, the defendant's requests for vouchers previous to October 1986 and the informant's Federal rapsheet were denied.

The defendant relies on *Raess* (146 Ill. App. 3d 384, 496 N.E.2d 1186) to support his argument for full disclosure. While it is true, as the State argues, that the State in *Raess* did not disclose even the name of the informant, the court did not limit its discussion to that aspect. It ruled that the defendant was entitled to disclosure of information regarding the informant for the purpose of preparing a defense founded on the entrapment theory. 146 Ill. App. 3d at 392.

Besides the rules for disclosure of an informant and pertinent information, the State was also obligated under Supreme Court Rule 412(a) (107 Ill. 2d R. 412(a)) to give the defendant certain information about a rebuttal witness. The State first argues that they cannot know for certain if a witness will be called in rebuttal until the defense testimony is heard. They then argue that they substantially complied with Rule 412(a) by disclosing the name of the informant and certain DEA payment vouchers made to him. Rule 412(a), however, is not limited to disclosure of the informant's name and selected discovery that the State decides is important to the defendant. Supreme Court Rule 412(a) (107 Ill. 2d R. 412(a)) states:

> "If the State has obtained from the defendant *** information regarding defenses the defendant intends to make, it shall provide to defendant not less than 7 days before the date set for the hearing or trial, or at such other time as the court may direct, the names and addresses of witnesses the State intends to call in rebuttal, together with the information required to be disclosed in connection with other witnesses by subdivisions (i), (iii), and (vi), above, and a specific statement as to the substance of the testimony such witnesses will give at the trial of the cause."

 Although the trial court relied on the State's misrepresentations in quashing the two subpoenas, it erred in allowing the informant to testify as a rebuttal witness without the requested discovery documents being tendered. The State turned over selected voucher payments, a Chicago rapsheet, an Illinois State rapsheet, and made the informant available for an interview by the defense counsel. However,

the State was allowed to withhold the informant's Federal rapsheet as well as vouchers and other DEA informant communications that existed prior to October 1986.

■■ Although the trial court has discretion in allowing the rebuttal witness' testimony even without strict compliance with the discovery rule (*People v. Galindo* (1981), 95 Ill. App. 3d 927, 933, 420 N.E.2d 773), abuse of discretion is reversible error if it prejudices the defendant. Alone, this may not have prejudiced the defendant, but combined with the other trial errors, it was reversible error.

The defendant next asserts that he was denied a fair trial because the trial court refused to allow him to extensively cross-examine the informant about possible bias, interest, or motive to testify falsely. Although the defendant was allowed to cross-examine the informant about his payments from the DEA, he was not allowed to question him about his September 1986 arrest prior to the drug transactions involving the defendant and the dismissal of those charges by the State.

■■ ■ The sixth amendment to the United States Constitution protects the defendant's right of cross-examination. (*Davis v. Alaska* (1974), 415 U.S. 308, 315-16, 39 L. Ed. 2d 347, 353, 94 S. Ct 1105, 1110.) The exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. (*Davis*, 415 U.S. at 316-17, 39 L. Ed. 2d at 353-54, 94 S. Ct. at 1110-11.) While the scope of the cross-examination rests largely in the discretion of the trial court (*People v. Owens* (1984), 102 Ill. 2d 88, 103), that discretion must be exercised in such a way as to allow the defendant wide latitude in establishing bias, motive or interest by the witness. (*People v. Wilkerson* (1981), 87 Ill. 2d 151, 156; *People v. Adams* (1984), 129 Ill. App. 3d 202, 208, 472 N.E.2d 135; *People v. Pizzi* (1981), 94 Ill. App. 3d 415, 420, 418 N.E.2d 1024.) The fact that a witness has been arrested or charged with an offense may be inquired into to show that his testimony might be influenced by bias, interest, or a motive to testify falsely. (*Adams*, 129 Ill. App. 3d at 207.) In *Adams*, the appellate court rejected the State's argument that the defense counsel were on a fishing expedition and had no factual basis for the inquiry they sought to make. The court ruled that it was error for the cross-examination to have been so restricted that the defense was unable to explore the possibility that the witness may have been biased or be testifying falsely. 129 Ill. App. 3d at 207.

■■ ■ The defense counsel is not required to show beforehand that any promises of leniency have been made or any expectations of special favor exist in the mind of the witness. Defense counsel is entitled to inquire into such promises or expectations whether based on

fact or imaginary. (*People v. Freeman* (1981), 100 Ill. App. 3d 478, 481, 426 N.E.2d 1220.) In *Freeman*, the defendant was allowed only to inquire whether the witness had been promised anything in return for his testimony, but not to probe deeper. The court rejected the State's argument that the defendant must establish that the State had a deal with the witness before a more thorough cross-examination could be permitted. (100 Ill. App. 3d at 481.) Here, as in *Freeman*, the trial court erred by not allowing the defense counsel to inquire more fully into the informant's possible bias, motive or interest in falsely testifying.

▰ When a trial error affects a Federal constitutional right, it is reversible error unless it is harmless beyond a reasonable doubt. (*Owens*, 102 Ill. 2d at 104; *Freeman*, 100 Ill. App. 3d at 481.) In determining whether the error was harmless, the sufficiency of the evidence proving guilt beyond a reasonable doubt must be considered. (*People v. Pizzi* (1981), 94 Ill. App. 3d 415, 421, 418 N.E.2d 1024.) In *Pizzi*, the sufficiency of the case was based on the credibility of the State's witnesses. Although the State's evidence was sufficient to sustain a conviction, the case against the defendant was not overwhelming. It was a close case that turned on a determination of the credibility of the witnesses. Therefore, the court ruled that it was reversible error to prohibit the defense from presenting relevant impeachment of crucial prosecution witnesses. 94 Ill. App. 3d at 422.

▰ Here, as in *Pizzi*, the credibility of the informant was crucial to the State's case. The defendant was allowed to cross-examine the informant witness about his employment as a paid informant, but not to probe deeper. The only witnesses to testify to the defendant's predisposition or lack of predisposition were the informant and the defendant. The informant testified to the defendant's apparent ease in obtaining the drugs while the defendant was not allowed to testify that he knew the Talaveras had access to cocaine because Gabriel Talavera had previously offered cocaine to the defendant in lieu of his security deposit. There was some testimony from the agent, the informant, and the defendant that the defendant had said he did not want to be involved in the drug transactions in the future.

There was no testimony about any previous criminal record involving drugs. The only prior arrest was for a sexual assault that was not charged. There was no testimony that the defendant used drugs or had previously sold drugs. There was no testimony as to his familiarity with drugs, except that he asked the informant and agent to test the drugs. There was no evidence that the defendant had a profit motive. There was evidence that the criminal activity was initiated by the gov-

ernment. Because the evidence of the defendant's guilt was not overwhelming and he was not allowed to fully present a defense, the abuse of discretion was not harmless beyond a reasonable doubt, but was reversible error.

■■ Next, the defendant asserts that the trial court erred in refusing to allow him to present surrebuttal evidence to impeach the informant's testimony. Where the prosecution in rebuttal is permitted to introduce new evidence, the defendant must be permitted to introduce evidence in surrebuttal. *People v. Lott* (1975), 33 Ill. App. 3d 779, 787-88, 338 N.E.2d 434, *aff'd* (1977), 66 Ill. 2d 290.

■■ Although the State argues that the testimony would be merely cumulative, the informant introduced new evidence when he testified that he did not meet the defendant until October 8, 1986, and that he did not know that defendant had a family. The defendant, therefore, was entitled to present a surrebuttal witness to impeach the credibility of the informant. The defendant made an offer of proof that Allan Kirshner, a lawyer who rented space in the defendant's office, would testify that the defendant's children were in the office everyday and inevitably the informant would have seen the children. He also would have testified that the informant began coming to the office in July or August 1986.

The State also argues that the defendant was not prejudiced even if there was error because there was overwhelming evidence of the defendant's guilt. However, as explained earlier, there was not overwhelming evidence of defendant's guilt, especially about the defendant's predisposition to commit the crime. Consequently, the defendant was prejudiced by the trial court's error in not allowing his surrebuttal evidence.

The defendant's convictions are reversed and remanded to the trial court for a new trial. The above issues are dispositive, so we will not reach a decision on the other issues raised by the defendant.

Reversed and remanded.

RIZZI and WHITE,* JJ., concur.

---

*Justice Freeman heard the oral argument in this case, and following his election to the supreme court, Justice White was substituted, he listened to the tape of oral argument and read the briefs and record.